Quinlan, J.
The plaintiff, C.W. Keller & Associates, Inc. (“Keller”), through its president Charles Keller, has brought a legal malpractice action against several attorneys and their respective law firms. Defendants Daniel S. Gindes (“Gindes”) and the law firm of Gindes and Correia (“G&C”) now move for summary judgment pursuant to Mass.R.Civ.P. 56(c) on the ground that Keller had no attorney-client relationship with them upon which to base a legal malpractice claim. Defendants Mark G. Morisi (“Morisi”), Martin O’Connell (“O’Connell”), and the law firm of Morisi and O’Connell (“M&O”) have filed a separate motion for summary judgment on the same ground. For the reasons set forth below, the motion of Defendants Gindes and G&C is ALLOWED and the motion of Morisi, O’Connell, and M&O is DENIED.
BACKGROUND
The following facts are undisputed. Keller is a business which produces custom woodwork, cabinetry, and furniture. In 1989, Keller, as a subcontractor, delivered goods valued at approximately $100,000 to a medical building located at 67 Belmont Street, Worcester, Massachusetts. Leonard Getiy (“Getty”), the general contractor, only partially paid Keller. Consequently, Keller retained the law firm of Cullen and Butters (“C&B”) to initiate collection proceedings for the monies owed him.
On July 5, 1989, Albert Cullen, Jr. (“Cullen”), a partner at C&B, and Judi Sanzo (“Sanzo”), an associate at the firm, filed four separate lawsuits in Worcester Superior Court on Keller’s behalf against Getty and various condominium owners. Each suit sought relief only under the mechanic’s lien statute. Only two of the suits are the subject of the current legal malpractice action: C. W. Keller & Associates v. Leonard Getty, dba L&G Contracting, and John Liland (Civil Action No. 1980) (“the Liland case”) and C.W. Keller & Associates v. Leonard Getty, dba L&G Contracting and New Entity Realty, Inc. (Civil Action No. 89-1982) (“the New Entity case”).
Procedural History of the New Entity Case
On July 5, 1989, C&B filed a motion for summary judgment on Keller’s behalf in the New Entity case. On July 31, 1989, the court allowed Keller’s motion and, on August 2, 1989, entered judgment against Getty and New Entity in the amount of $50,709.37. On September 1, 1989, New Entity filed its notice of appeal; Getty, however, did not appeal the court’s judgment.
On June 21, 1991, the Appeals Court vacated the judgment for Keller on the ground that a signed copy of the contract was not before the trial court at the time summary judgment entered. The Court ordered that judgment was to enter for both Liland and Getty.Keller’s counsel did not file any further appeals or a motion for reconsideration. Subsequently, the Superior Court issued a written judgment in favor of Liland and Getty, which was then entered on the wrong docket.
In December 1991, Cullen and Susan Correia (“Correia”), an associate at C&B, filed a new lawsuit on Keller’s behalf against New Entity only. The suit contained counts for breach of contract, unjust enrichment, and violations of the UCC. New Entity filed a motion to dismiss, which was unopposed. Subsequently, in January 1992, the court granted New Entity’s motion.
In April 1993, Keller’s counsel filed a motion to enter the judgment for New Entity and Getty on the correct docket and to vacate the entry of judgment. Although the clerk entered it on the correct docket, the court denied Keller’s motion to vacate the judgment. In May 1993, Keller’s counsel then filed a motion for relief from the judgment and a motion to amend the complaint, which was denied in July 1993. In July, Keller’s counsel filed a motion for reconsideration, which was denied. On September 17, 1993, they attempted to have the motion for reconsideration heard again, which was again denied in October.
On October 21, 1993, Keller’s counsel filed a notice of appeal of both the April entry of judgment for Getty and New Entity and the denial of the motion to amend the complaint. The record does not reflect the final disposition of Keller’s appeal.
Procedural History of the Liland Case
On July 5, 1989, C&B moved for summary judgment in the Liland case. Liland filed a cross motion for summary judgment. On August 23, 1989, the court granted Liland’s motion for summary judgment on the ground that Keller failed to strictly comply with the mechanic’s lien statute. On April 9, 1990, after an unsuccessful appeal to a single justice of the Appeals *272 Court, the court entered a final judgment for Liland. As to Getty, the court entered a default judgment against him in the amount of $9,502.35, plus interest and costs on April 23, 1990.
Keller appealed the trial court’s decision in favor of Liland. On December 7, 1992, the Appeals Court reversed the summaiy judgment in favor of Liland and remanded the case for further proceedings. Thereafter, Keller and Liland settled the lawsuit prior to trial.
Succession of Attorneys
When Keller initially retained C&B, Sanzo was an associate at the firm. Thereafter, from December 15, 1989 to November 5, 1990, Sanzo was an associate at the firm of M&O. Sanzo brought Keller’s file with her and continued to work on it in conjunction with Cullen. After Sanzo’s tenure with the firm ended, M&O sought compensation from C&B for the 69.7 hours that she spent on Keller’s file. Sanzo became a solo practitioner and continued to perform legal services for Keller. Subsequently, she moved to California and Keller’s file was returned to C&B.
In late 1991, upon the return of the file, Cullen and Correia, who was hired as an associate in March 1991, worked on Keller’s case. In March 1993, Correia left M&O and opened her own law practice as a solo practitioner. From March 1993 to August 1993, she continued to render legal services to Keller in conjunction with Cullen. Correia learned that Keller retained successor counsel in September or October 1993. On October 20, 1993, she filed some pleadings on Keller’s behalf.
On November 1, 1993, Correia and Gindes formed G&C, a law firm partnership. G&C performed no legal services for Keller, but on November 4, 1993, Correia sent him correspondence on the firm’s letterhead to notify him that a new trial date had been scheduled. On February 3, 1994, Correia filed a motion to withdraw as Keller’s attorney of record.
Procedural Histoiy of Legal Malpractice Action
On June 15, 1994, Keller filed a legal malpractice action against the following: the firm of C&B and its partners, Cullen and Butters; the firm of M&O and its partners, Morisi and O’Connell; the firm of G&C and its partners, Gindes and Correia; and Sanzo. In his complaint, Keller asserts counts for negligence, breach of contract, and violations of G.L.c. 93A. Specifically, Keller alleges that several attorneys and firms, at numerous times, committed several acts of legal malpractice throughout the periods they were retained to render legal services. All the defendants have denied Keller’s allegations and brought cross claims against one another for indemnity and contribution. Now before the court are motions for summary judgment by Defendants Gindes, G&C, Morisi, O’Connell, and M&O.
DISCUSSION
This court grants summary judgment where there are no genuine issues of material fact and where the summaiy judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1982); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, “and [further] that the summary judgment record entitles the moving party to judgment as a matter of law.” Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not bear the burden of proof at trial must demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case or by showing that the nonmoving party is unlikely to submit proof of that element at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “The nonmoving party cannot defeat the motion for summaiy judgment by resting on its pleadings and mere assertions of disputed facts ..." LaLonde v. Eisnner, 405 Mass. 207, 209 (1989). The nonmoving party’s failure to prove an essential element of its case “renders all other facts immaterial” and mandates summaiy judgment in favor of the moving party. Kourouvacilis, supra, at 711 (citing Celotex v. Catrett, 477 U.S. 317, 322 (1986)).
A. Defendants Gindes and G&C
Defendants Gindes and G&C argue that they cannot be held liable for legal malpractice because they did not establish an attorney-client relationship with Keller. They contend that Ms. Correia’s attorney-client relationship and attendant duties to Keller terminated prior to the formation of G&C. Keller maintains that Defendants Gindes and G&C are indeed liable for legal malpractice because Ms. Correia continued to render legal services to the company even after she became Gindes’ partner.
The Uniform Partnership Act, G.L.c. 108A (1996 ed.), applies to partners who engage in the practice of law. See Starr v. Fordham, 420 Mass. 178, 192-93 (1996); Jurgen v. Abraham, 616 F.Sup. 1381, 1387 n.10 (D.Mass. 1985). Under c. 108A, §13, a partnership is liable to third persons for “any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership ... to the same extent as the partner so acting or omitting to act.” All partners are jointly and severally liable for a tort committed by any individual partner. G.L.c. 108A, §15. Therefore, both a law firm and the partners therein are potentially liable for one partner’s legal malpractice.
To establish a viable legal malpractice claim, a plaintiff must show that an attorney-client relationship existed when the alleged negligence occurred. See *273 DeVaux v. American Home Assurance Co., 387 Mass. 814, 817 (1983). An attorney-client relationship is a prerequisite to establishing a breach of duty and imposing liability on an attorney for negligence. Id. The attorney’s duty to the client survives until the attorney-client relationship is terminated. R.E. Mallen & J.M. Smith, Legal Malpractice §8.2, at 564 (4th ed. 1996).
The attorney-client relationship may terminate in various ways. The relationship ends if either party dies. Mallen & Smith, Legal Malpractice, supra, at 564. If several years have passed since an attorney has rendered legal services for a client, the relationship has terminated due to lapse over time. Atromick Int’l Inc. v. Drustar Inc., 134 F.R.D. 226, 229-30 (S.D. Ohio 1991). Finally, termination occurs if either party makes an explicit statement to that effect or performs an “act inconsistent with the continuation of an attorney-client relationship.” Id. at 229.
Although the issue has not been addressed by Massachusetts courts, other jurisdictions have held that a client who retains new counsel severs his attorney-client relationship with the prior attorney. Stroud v. Ward, 169 Mich. App. 1, 4; 425 N.W.2d 490, 492 (1988) (retention of new counsel effectively terminated attorney-client relationship); Barr v. Day, 124 Wash.2d 318, 329; 879 P.2d 912, 917-18 (1994) (attorney-client relationship severed where lawyer was fired and new attorney hired). A client who secures new counsel terminates his relationship with his previous lawyer irrespective of whether the lawyer’s name continues to appear as attorney of record. Barry v. Ashley Anderson P.C., 718 F.Sup. 1492, 1494 (D.Colo. 1989); Shapero v. Fliegel, 191 App.3d 842, 847-48; 236 Cal. Rptr. 696, 699-00 (1987); Baker’s Serv. v. Robinson, 445 N.Y.S.2d 630, 632 (App.Div. 1981). Thus, a court may find that the attorney-client relationship has terminated despite a lawyer’s failure to formally withdraw as attorney of record. Mallen & Smith, Legal Malpractice, supra, at 564.
In the instant case, it is undisputed that Keller retained successor counsel in September or October 1993. Neither Keller’s answers to interrogatories nor deposition testimony establish that Ms. Correia continued to perform legal services for it after November 1, 1993, the date on which G&C was formed. Notably, although Charles Keller testified in his deposition that he twice met with Ms. Correia in G&C’s offices, he could not recall the month and year of those meetings. Further, the pleadings that Ms. Correia filed on October 20,1993 and the correspondence she sent to Keller on G&C letterhead to notify it of a new trial date are not conclusive evidence of an attorney-client relationship. Rather, these acts were consistent with her general duty to prevent prejudice to a former’s client’s case.[2] Moreover, Ms. Correia’s delay in filing a motion to withdraw as attorney of record is insufficient alone to conclude that she remained Keller’s attorney while a partner at G&C.
Therefore, reviewing the summaiy judgment record in the light most favorable to Keller, this court must nevertheless conclude that it terminated its relationship with Ms. Correia when it retained successor counsel in September or October 1993, an act inconsistent with the continuation of their attorney-client relationship. In the absence of such a relationship, Ms. Correia, Gindes, and G&C are not liable to Keller for legal malpractice. Thus, this court must allow Gindes and G&C’s motion for summaiy judgment.
B. Defendants Morisi, O’Connell, and M&O
In their separate motion for summary judgment, Defendants Morisi, O’Connell, and M&O argue that they are not liable for legal malpractice because they had no attorney-client relationship with Keller. In support of their argument, they state that Keller did not sign a fee agreement with M&O, meet the partners, or receive bills from the firm. Keller asserts that the very arguments upon which Defendants Morisi, O’Connell, and M&O rely to demonstrate the absence of an attorney-client relationship are the material facts in dispute which justify denying summary judgment.
An attorney-client relationship may arise from an express contract or be implied from the conduct of the parties. Page v. Frazier, 388 Mass. 55, 62 (1983); DeVaux, supra, at 817-18. The relationship may be implied “when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney’s professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance ... In appropriate cases the third element may be established by proof of detrimental reliance, when the person seeking legal services reasonably relies on the attorney to provide them and the attorney, aware of such reliance, does nothing to negate it.” DeVaux, supra, at 818, quoting Kurtenbach v. TeKippe, 260 N.W.2d 53 (Iowa 1977). The trier of fact must resolve any disputes as to the existence of an attorney-client relationship. Id.
Upon reviewing the summary judgment record, this court agrees that whether Keller had an attorney-client relationship with M&O is a disputed issue of material fact. There is a dispute as to whether M&O billed Keller for the legal services performed by Ms. Sanzo. Although M&O cites the absence of a fee agreement and Charles Keller’s failure to recall receiving a bill during his deposition testimony, Keller has produced three invoices on M&O letterhead which were allegedly submitted to it during Ms. Sanzo’s eleven-month tenure at the firm. Because each invoice reflects a credit balance from which expenses seem to have been deducted as they arose, questions arise as to whether M&O sought compensation directly from Keller for the time Ms. Sanzo spent on its file. While the sole fact that a client paid an attorney is not *274 sufficient to establish an attorney-client relationship, a bill for legal services plus circumstances which show that a client relied upon a lawyer for legal advice may create an attorney-client relationship. Compare Deloury v. Deloury, 22 Mass.App.Ct. 611, 614-15 (1986) (attorney-client relationship existed where plaintiff asked lawyer to perform some legal work and was billed for services), with Sheinkopf v. Stone, 741 F.Sup. 323, 324 (D.Mass. 1990) (no attorney-client relationship where plaintiff received no bills and did not rely on attorney for legal advice).
Besides the question over billing, the parties also disagree on the issue of whether Keller retained M&O to represent it. Relying on Charles Keller’s deposition testimony that he neither entered into a fee agreement with the firm nor met the partners, Defendants Morisi, O’Connell, and M&O claim that Keller merely maintained a relationship strictly with Ms. Sanzo, who was handling the matter in conjunction with C&B, her former employer. However, according to Charles Keller’s deposition testimony, “(wje started out with Cullen and Butters and Judy [sic] Sanzo then we were Morisi and O’Connell then we were Judy [sic] Sanzo by herself, and now I’m back at Cullen and Butters and I have Susan Correia thrown in.” This ambiguous testimony seems to reflect Keller’s belief that M&O represented it while Ms. Sanzo was an employee of the firm.
Because there are factual disputes as to billing and M&O’s representation of Keller between December 15, 1989 and November 5, 1990, this court is unable to conclusively determine whether an attorney-client relationship existed between Keller and M&O. Therefore, Defendants Morisi, O’Connell, and M&O’s motion for summary judgment must be denied on this ground.
Furthermore, Defendants Morisi, O’Connell, and M&O claim that any attempt by Keller to hold them vicariously liable for Ms. Sanzo’s alleged negligence must fail because she was not motivated to serve the firm when she continued to represent it. However, the summary judgment record reveals that this is also a disputed issue of material fact.
An employer may be held vicariously liable for the negligence of its employees under the theoiy of respondeat superior. Kelly v. Middlesex Corp., 35 Mass.App.Ct. 30, 32 (1993). Under this theory, the plaintiff must prove that the employee was acting within the scope of her employment at the time the negligent conduct occurred. Id. An employee’s tortious conduct falls within the scope of her employment “if it is of the kind he is employed to perform; if it occurs substantially within the authorized time and space limits; and if it is motivated, at least in part, by a purpose to serve the employer." Wang Labs., Inc. v. Business Incentives, Inc., 398 Mass. 854, 859 (1986) (citations omitted). The employee’s acts are outside the scope of employment if they are “driven by purely 'personal purposes, unconnected in any way with the employer’s interests.” Kelly, supra, at 32.
There is a factual dispute on the issue of whether Ms. Sanzo was motivated to serve M&O as she continued to represent Keller. Defendants Morisi, O’Connell, and M&O claim that they arranged to receive compensation directly from C&B for the time Ms. Sanzo spent on Keller’s case file. They also cite their correspondence to C&B, which recounts the total amount of hours spent by Ms. Sanzo on Keller’s case, as evidence that they did not stand to benefit from her activities. However, according to the documents produced by Keller in his summary judgment materials, M&O sent at least three invoices directly to him. These invoices create questions as to whether M&O actually did seek to benefit from Ms. Sanzo’s activities.
Moreover, there is a dispute over the issue of whether Ms. Sanzo committed negligence while she was employed by M&O. Defendants Morisi, O’Connell, and M&O state that the 69.7 hours which Ms. Sanzo spent on Keller’s file between December 15, 1989 and November 5, 1990 were minimal since the cases were pending in the Appeals Court. With respect to the New Entity case, they claim that Ms. Sanzo did not negligently fail to collect on the default judgment against Getty because the appeal filed by New Entity stayed collection until the Appeals Court reviewed his case. Further, they state collection would have been impossible because the Appeals Court eventually reversed the judgments against both New Entity and Getty. With respect to the Liland case, Defendants point out that the Appeals Court did not reverse the summary judgment in favor of Liland until December 7, 1992, a year after Ms. Sanzo terminated her employment with M&O.
In his answers to interrogatories, Keller refutes Defendants’ arguments. Its expert witness, Robert Osol, Esq., will testify that Keller’s attorneys failed to secure entry of judgment and a writ of execution against at least Getty, who did not even appeal the Superior Court judgment that was reversed by the Appeals Court on June 21, 1991. Furthermore, Keller has produced a letter from Liland which indicates that the latter would have possessed the funds to pay Keller. Liland allegedly decided not to pay because he believed that Keller’s attorneys failed to file the correct documents with the court.
Therefore, in light of these disputed issue of material fact, the court must deny Defendants Morisi, O’Connell and M&O’s motion for summary judgment.
ORDER
For the foregoing reasons, it is hereby ORDERED that the motion for summary judgment of Defendant Gindes and Correia and Daniel S. Gindes is ALLOWED. It is further ORDERED that the motion for summary judgment of Defendants Mark G. Morisi, Martin O’Connell, and Morisi and O’Connell is DENIED.

 S.J.C. Rule 3:07, DR2-110 states that “alawyer shall not withdraw from employment until he has taken reasonable steps to avoid foreseeable prejudice to the rights of his client, including giving due notice to his client, allowing time for employment of other counsel, delivering to the client all papers and property to which the client is entitled, and complying with applicable laws and rules” (emphasis added).