CHARLES LEV vs. BEVERLY ENTERPRISES-MASSACHUSETTS, INC.[1]

No. 08-P-58.

Middlesex. October 8, 2008. - June 18, 2009.

Present: BERRY, McHUGH, & GRAINGER, JJ.

Further appellate review granted, 455 Mass. 1103 (2009).

*Alcoholic Liquors,* Motor vehicle, Liability of host. *Negligence,* Alcoholic liquors, Motor vehicle, Employer, Social host. *Motor Vehicle,* Agency, Operating under the influence. *Agency,* Scope of authority or employment.

In a civil action for damages sustained when the plaintiff was hit by a car driven by the defendant's employee after the employee had drunk alcohol at a restaurant while meeting with his work supervisor, the judge properly entered summary judgment in favor of the defendant on the claim of employer host liability, where the defendant had no duty of care to the plaintiff because it did not furnish and control the alcohol served to the employee, and where the existence of a policy, codified in an employee manual, that prohibited the defendant's employees from drinking alcohol on company premises or while conducting company business off company premises did not create a special relationship between the defendant and the employee that required the defendant to prevent the employee from causing harm to others, or confer on the defendant the ability to control the employee vis-à-vis the outside world. [415-422] McHUGH, J., dissenting.

In a civil action for damages sustained when the plaintiff was hit by a car driven by the defendant's intoxicated employee, who was in his own vehicle and on his way home after having left a restaurant where he had been drinking alcoholic beverages while meeting with his work supervisor, the judge properly entered summary judgment in favor of the defendant on the claim of liability under the doctrine of respondeat superior, where at the time the employee negligently struck and injured the plaintiff, he was not engaged in conduct for which he was employed. [422]

CIVIL ACTION commenced in the Superior Court Department on August 16, 2006.

[1]The plaintiff also sued John Ahern, Ellen Ahern, South Pacific, Inc., and Heathwood, Inc. After the judge granted summary judgment in behalf of Beverly Enterprises-Massachusetts, Inc. (Beverly), a separate and final judgment was entered dismissing the plaintiff's claims against Beverly, see Mass. R.Civ.P. 54(b), 365 Mass. 820 (1974), and the plaintiff appealed from that judgment.

The case was heard by *Christine M. McEvoy*, J., on a motion for summary judgment, and entry of final and separate judgment was ordered by *Merita A. Hopkins*, J.

*Marc Diller* (*Benjamin Ian Julier* with him) for the plaintiff.

*Joseph M. Desmond* (*Lawrence F. Boyle* with him) for the defendant.

BERRY, J. The plaintiff sued the defendant, Beverly Enterprises-Massachusetts, Inc. (Beverly), for serious injuries sustained when the plaintiff was hit by a car driven by Beverly employee John Ahern. At the time of the accident, Ahern was intoxicated and had just left a restaurant where he had been drinking alcoholic beverages while meeting with his work supervisor. Ahern was arrested for, and convicted of, operating while under the influence of intoxicating liquor (OUI). The OUI conviction was his third such conviction.

A Superior Court judge entered summary judgment for Beverly. This case, in the main, is controlled by the holdings in *Mosko* v. *Raytheon Co.*, 416 Mass. 395 (1993) (*Mosko*); *Kelly* v. *Avon Tape, Inc.*, 417 Mass. 587 (1994) (*Kelly*); and *Commerce Ins. Co.* v. *Ultimate Livery Serv., Inc.*, 452 Mass. 639 (2008) (*Ultimate*). Based on this precedent, potential employer host liability cannot as matter of law be imposed against Beverly. Accordingly, we affirm.[2]

1. *The summary judgment record.* Ahern worked as a chef between the hours of 7:00 A.M. and 5:30 P.M. at a nursing home owned and operated by Beverly. On March 11, 2004, after completing his shift at around 5:45 P.M., Ahern went to the South Pacific restaurant to meet with his supervisor, Lynda Pacitti. It is disputed whether the meeting was prearranged or whether Ahern was required to attend.[3] It is not disputed that work matters were discussed at the meeting between Ahern and his

---

[2] Although the cited cases are controlling, there is a further element in this case which arises out of a policy set forth in the Beverly employee manual concerning alcohol-related drinking. In brief, the policy prohibits employees from possessing, consuming, selling, distributing, or being under the influence of alcohol on company premises or while conducting company business off company premises and imposes standards of responsibility and professionalism upon employees in attendance at company-sponsored social events. The policy is addressed in part 2.b of this opinion and in the dissent.

[3] According to Ahern, he went there because traffic was poor and Pacitti

supervisor. Both had drinks during the course of the approximately one hour and fifteen minutes they were present at the restaurant together. Ahern drank vodka and soda water. At or around 7:00 P.M., Ahern paid the tab for both his and Pacitti's drinks, got into his private automobile, and headed home. Shortly after leaving the South Pacific restaurant, Ahern struck the plaintiff.

2. *Employer host liability analysis.* a. *Massachusetts decisions.* As noted above, the lead cases on the issue whether employer host liability may be imposed are *Mosko, supra*; *Kelly, supra*; and *Ultimate, supra.* In *Mosko*, the employer sponsored a holiday party at an off-site restaurant, which was advertised in the workplace as the Raytheon Christmas party and as to which the company contributed $1,750 to cover part of the costs. However, there was a cash bar, and the restaurant staff served the drinks. An intoxicated Raytheon employee left the party and, while driving home, struck the plaintiff, Mosko. *Mosko*, 416 Mass. at 396. Against this backdrop, the Supreme Judicial Court focused on the issue of control of the alcohol. The court noted that "our cases have emphasized that a social host's duty of care derives from the host's actual control of the liquor supply," and the court held that "[o]nly when a host controls the liquor supply is it reasonable to assume that a host has the ability to monitor the guests' alcohol consumption." *Id.* at 402.

The *Kelly* case extended the rule set out in *Mosko* to circumstances in which an employee stored beer on the business premises and the employer had knowledge of the employee's alcohol consumption. Specifically, in *Kelly*, the employee stored beer in the company refrigerator, drank the beer during work hours, and left the workplace in a drunken state, all with the knowledge of the employer. *Kelly*, 417 Mass. at 588. The court held, as matter of law, that there was no duty of care on the employer's part and hence no liability to the injured party. The court saw "no reason in the present case [*Kelly*] to depart from the principle which we announced in *Mosko, supra.*" *Kelly*, 417 Mass. at 589. The court's

happened to show up; they spoke about various subjects, including that day's work and current events, drank, and watched the news. According to Pacitti, she arranged to meet Ahern there to discuss work and brought nursing home menus prepared to plan for the public health survey that was to take place the following week.

analysis (as in *Mosko*) focused on the fact that the employer did not furnish or control the beer the employee drank. Therefore, the court held, "the defendant [employer] owed no duty to protect members of the general public from the consequences of [the employee's] intoxication. Because the defendant owed no duty of care to the plaintiffs under the doctrine of host liability, the Superior Court judge correctly allowed the defendant's motion for summary judgment on this issue." *Ibid.* Both *Mosko* and *Kelly* stand for the legal principle that, if the employer does not furnish and control the alcohol consumed by the intoxicated employee, there is no employer-based duty of care, and there is no employer host liability for any ensuing negligent acts of an intoxicated employee. Accord *Ulwick* v. *DeChristopher*, 411 Mass. 401, 407 (1991) ("[T]he consideration that the duty of care follows from control over the liquor supply . . . furnish[es] practical limits of potential liability").

Citing the case of *Ulwick* v. *DeChristopher, supra*, in the recent case of *Ultimate*, 452 Mass. at 646, the Supreme Judicial Court reiterated that social host liability is not a legally tenable theory of recovery where a putative defendant is not the alcohol supplier. In that case, the defendant Ultimate Livery Service, Inc. (Ultimate), provided livery transportation services for social events. It was anticipated that the passengers to be driven about by Ultimate were likely to engage in alcohol drinking at various venues. It was in connection with such a drinking-related event, a bachelor party, that several men were transported to and from bars and party sites by an Ultimate livery driver. Thereafter, the driver dropped off several partygoers near the place where a friend had left a car. A partygoer, who was heavily intoxicated, drove the car away and hit another car, causing death to one person and serious injury to three other persons. The court held that because "[t]here is no evidence . . . that Ultimate or [its employee driver] provided or served [the intoxicated driver] with the alcohol he consumed . . . summary judgment [correctly entered as matter of law] in favor of Ultimate and [its driver] on the social host liability claims." *Ibid.* In so holding, the court relied on the precedent "[i]n numerous social host cases, [wherein] we have held that a social host is not liable to a person injured as a result of a guest's excessive consumption of alcohol that was not owned or furnished

by the host." *Ibid.,* quoting from *Burroughs* v. *Commonwealth,* 423 Mass. 874, 878 (1996).[4]

b. *The employee alcohol consumption policy.* The aforecited precedent compels, we believe, the affirmance of summary judgment in this case. There is, however, a factor in this case not previously addressed in the case law. That factor is the existence of a policy codified in an employment manual which prohibits Beverly employees from, among other things, drinking alcohol on company premises or while conducting company business off company premises. There are disciplinary sanctions for a violation of the policy. We set forth the Beverly policy below.[5]

[4]Another, separate theory of liability advanced in *Ultimate* was based on negligence and a duty of care owed by Ultimate and its driver to the plaintiff-occupants of the car involved in the accident under the theory that Ultimate and its driver knew or should have known that the intoxicated individual was likely to operate an automobile and that the Ultimate van driver should not have discharged him from the van at that place. See *Ultimate,* 452 Mass. at 646-650. On this negligence theory of liability, the Supreme Judicial Court reversed the entry of summary judgment, but "emphasize[d], however, that our finding of possible liability in this case is limited to the facts described above and our holding that a duty exists on these facts does not signal that liability may be found in cases involving other private carriers for hire with dissimilar facts." *Id.* at 650. The narrow scope of the negligence liability theory addressed in the majority opinion in the *Ultimate* case was highlighted in the concurrence of three justices as follows. "Consistent with tort principles previously recognized by this court, [the court in this decision] conclude[s] that a private carrier owes a duty to a third person who is injured by the negligence of one of its passengers whom it permitted to drink alcohol while in the vehicle, when the private carrier knew or reasonably should have known that the passenger was intoxicated. Consequently, [the three justices concurred] with the court's judgment that in the particular circumstances of this case, summary judgment for the defendants should be set aside." *Id.* at 656-657 (Cordy, J., concurring in the judgment, with whom Marshall, C.J., and Botsford, J., joined). The point of narrowing the scope of the holding was later repeated in the concurrence as follows. "[T]he court's opinion [is not to be read as having] created a duty broader than what . . . may be imposed in the circumstances presented here — Ultimate's willingness to allow its passenger to consume alcohol in its vehicle when (a jury could find) its driver knew or should have known that the passenger was inebriated." *Id.* at 661.

The narrow negligence theory of liability involving a private carrier duty of care recognized in *Ultimate* is not at issue in the instant case. Rather, only the social host theory of liability rejected in *Ultimate* is at issue.

[5]Beverly's human resources management policy and procedures manual (effective date May 1, 1998), which was applicable to Beverly associates, provided as follows:

"It is Beverly's policy to provide a safe environment that promotes the

For the reasons that follow, we conclude that the existence of such an employer policy prohibiting drinking does not override the fundamental legal principles set in *Mosko* and *Kelly*. Indeed, in *Mosko*, the court rejected the proposition that "an employer's special relationship with its employees, and the concomitant ability to control their actions, warrants imposition of a duty on an employer hosting or sponsoring an employee party to take reasonable steps to prevent employees from driving while intoxicated, even when the employer neither furnishes nor controls the alcohol served at the party." *Mosko,* 416 Mass. at 400, 402-403. In reaching this determination, the court, in a footnote, see *id.* at 400 n.7, reviewed Restatement (Second) of Torts §§ 315 and 317 (1965).[6,7] The court, noting that courts in

welfare of its residents, associates and visitors. Substance, drug, and alcohol abuse threaten the quality of patient care and the safety of our residents and associates. Beverly, therefore, will implement and maintain a drug and alcohol free workplace policy at each of its facilities that meets the requirements of The Drug and Alcohol Free Workplace Act of 1988.

"  . . .

"B. *Alcohol.* Associates are prohibited from possessing, consuming, selling, distributing, or being under the influence of alcohol on company premises or while conducting company business off company premises. Occasionally, alcohol may be served at company-sponsored social events. Alcohol may be served at such events only with the prior approval of the Executive director. Associates are expected to remain responsible and professional at company social events.

"  . . .

"E. *Discipline.* As [*sic*] associate is subject to discipline, up to and including discharge, in accordance with company disciplinary policy and procedure as set forth in HR-410 for the following:

"1. Any violation of the Substance, Drug, or Alcohol Abuse Policy."

[6]Restatement (Second) of Torts § 315 (1965) sets forth the black letter rule adverse to such a duty of care and then sets forth only a limited exception thereto as follows.

"There is no duty, here, so to control the conduct of a third person as to prevent him from causing harm to another *unless*

"(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct . . . ." (Emphasis supplied.)

[7]Restatement (Second) of Torts § 317 (1965), which is directed to the

a number of jurisdictions had determined that "the principles expressed in §§ 315 and 317 cannot be read to impose a duty on the employer," concluded that "§ 317 cannot be read to apply to an accident that occurs when an employee is driving his own vehicle and is not on his employer's premises." *Mosko*, 416 Mass. at 401 n.7.

That the above two Restatement sections were *not* accepted by the Supreme Judicial Court as imposing a duty of care on an employer undermines the employee-control/duty of care framework articulated in the dissent. It is hard to see how the existence of an employer policy prohibiting drinking on the job by itself changes the usual rules governing an employment relationship and creates a "special relation" (§ 315) between the actor (the employer) and the third person (the employee) requiring the employer to prevent the employee from causing harm to other, outside persons, or confers on the master (the employer) the "ability to control" (§ 317) the servant (the employee) vis-à-vis the outside world. In short, it is hard to see whence comes the control and duty of care imposed upon the employer (such as the dissent posits), which, in turn, may give rise to employer host liability to any person in the outside world who may be hurt by the employee's excessive drinking, driving, and causing an accident. Simply issuing a company policy against drinking on the job cannot be deemed to have so broad a reach. Nor

---

"Duty of Master to Control Conduct of Servant," was also rejected by the court as imposing liability on an employer. Section 317 provides as follows.

"A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if

"(a) the servant

"(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

"(ii) is using the chattel of the master, and

"(b) the master

"(i) knows or has reason to know that he has the ability to control the servant, and

"(ii) knows or should know of the necessity and opportunity for exercising such control."

does such a policy confer the kind or level of control of employee drinking that the dissent envisions.

The dissent concludes that as matter of law an employment alcohol prohibition policy, in and of itself and standing alone, may be deemed to impose a duty of care on the employer and to alter the general rule announced in *Mosko* and *Kelly* as to no employer host liability. The linchpin to the well written, and provocative, framework set forth in the dissent is as follows.

> "Implicit in that analytical framework, [which the dissent rejects,] . . . is that control of the alcohol supply is [only] one of two obvious ways to prevent intoxication. The other [framework, which the dissent endorses,] is control of the consumer. . . . [T]he employer conducting a business meeting can control the employee's behavior, particularly where, as here, the employer's ability to control that behavior is evidenced by promulgation of an anti-alcohol rule purporting to do so."

*Post* at 427. However, the points posited and the employee-control/duty of care concept spun in the dissent are not the law. Rather, the law, as set forth throughout this opinion and as defined in *Mosko* and *Kelly*, speaks of the ability to control the alcohol as a predicate for employer host liability, *not* the ability to control the employee-drinker.

The dissent's position would be a broad extension of employer host alcohol-related law. Indeed, to follow the lead in the dissent might dissuade businesses from adopting an alcohol prohibition policy for employees because the mere existence of such a policy might be a predicate for tort liability. Furthermore, the dissent's position leads into a thicket of legal issues in employment law and of problems in practical application.[8] While the dissent is intriguing, most respectfully, it appears not to be in accord with

---

[8]Where is there any basis in this record, or in common experience, to conclude that just because there may be a company policy against drinking, in a meeting between two employees in a restaurant at which business is discussed, control over an employee's drinking ineluctably flows from the policy and one employee is empowered to order another employee not to drink? What if it is the executive/boss who is drinking — then, is the less senior worker supposed to enforce the policy at the restaurant by warning that the boss will be fired, even though the worker has no supervisory power over the boss? Even if this restaurant meeting were considered to be business-related, what was the

existing law, may pose difficulties in respect to principles of employment law, and may, in the everyday of working life, be practically unworkable.

c. *Decisions of other State courts.* Finally, to be noted is that other State courts which have addressed the effect of an employment policy against alcohol consumption by company employees have, to the extent of our research, in the main held that such a policy does not create employer host liability. See, e.g., *Premo v. General Motors Corp.*, 210 Mich. App. 121, 123-125 (1995) ("Defendant's internal policy of preventing intoxicated employees from driving did not, as a matter of public policy, amount to [the company's] assumption of a duty to protect the public at large"; "To impose liability upon an employer who, by means of work rules, policies, etc. undertakes to address the problem of alcohol use and/or abuse is clearly against public policy and would encourage employers to abandon all efforts which could benefit such employees in order to avoid future liability"); *Estate of Catlin v. General Motors Corp.*, 936 S.W.2d 447, 451 (Tex. Ct. App. 1996) (holding "that the mere creation of an internal policy regarding consumption of alcohol on the premises, whether or not the fish fry was a 'company function,' does not create a duty" to third parties); *Killian v. Caza Drilling, Inc.*, 131 P.3d 975, 978, 987-988 (Wyo. 2006) (declining to impose a duty on the employer to the general public when employees and their supervisor violated a no drinking policy and then proceeded to drive while under the influence and struck and killed a bicyclist). Compare *Peal v.*

---

supervisor supposed to do as a matter of employment oversight? How was she to stop the employee from drinking? Was she to tell the employee he would be fired for violating the company policy? If she affirmatively did tell the employee that he would be fired or disciplined under the company policy, then, if the employee kept drinking, left the restaurant while under the influence of alcohol (which had been drunk in the supervisor's presence), drove his car, and smashed into another car causing injury, would the employer be insulated, as matter of law, from potential employer host liability simply because the superior had tried (although unsuccessfully) to enforce the company policy and to control the employee? Just because there is a company policy, is there authority as a matter of employment law to fire or discipline the drinking employee on the spot? If not, how would discipline later help avoid the ensuing accident, if the employment discipline or termination did not occur forthwith on the spot at the restaurant drinking scene? Should there be a legal shield from third-party liability to an employer which has such a policy, but no such legal shield for an employer which has not published such a policy?

*Smith,* 115 N.C. App. 225, 233-234 (1994), aff'd, 340 N.C. 352 (1995) (per curiam) ("[T]he corporate defendant's establishment and memorialization of a[n] alcohol policy standing alone did not subject them to liability. However, the common law duty of a master to control his servant under certain circumstances as outlined in Restatement § 317, taken together with the defendants' own written policies established a standard of conduct that if breached could result in actionable negligence").

3. *Respondeat superior.* The plaintiff also argues that Beverly is responsible under the doctrine of respondeat superior. This contention is unavailing. "[R]espondeat superior is the proposition that an employer, or master, should be held vicariously liable for the torts of its employee, or servant, committed within the scope of employment." *Dias* v. *Brigham Med. Assocs.,* 438 Mass. 317, 319-320 (2002). "It has long been settled — as the plaintiff recognizes — that travel back and forth from home to a fixed place of employment is not ordinarily regarded as incident to employment and the employer is not answerable for an employee's torts in the course of such activity." *Kelly* v. *Middlesex Corp.,* 35 Mass. App. Ct. 30, 32 (1993). "Travel to and from home to a place of employment generally is not considered within the scope of employment." *Mosko,* 416 Mass. at 399. At the time Ahern negligently struck and injured the plaintiff, Ahern was driving his own vehicle home from the South Pacific restaurant and was not engaged in conduct for which he was employed, that is, cooking at the Beverly-owned nursing home.[9]

*Judgment affirmed.*

McHUGH, J. (dissenting). I respectfully dissent. In my view, general principles of tort law should have led to denial of the

_____

[9]The defendant's allegation that the plaintiff was required to file an affidavit pursuant to G. L. c. 231, § 60J, inserted by St. 1985, c. 223, § 17 (the dramshop act), which provides, in part, "Every action for negligence in the *distribution, sale or serving* of alcoholic beverages to a minor or to an intoxicated person shall be commenced in the superior court department and shall proceed according to the Massachusetts Rules of Civil Procedure unless otherwise provided for by this section" (emphasis supplied), is unfounded.

summary judgment motion, for the cases on which my thoughtful colleagues rely do not compel the result they reach.

When the present record is viewed, as it must be at this stage, in the light most favorable to the plaintiff and without regard to the motion judge's reasoning, see, e.g., *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991); *Clean Harbors, Inc.* v. *John Hancock Life Ins. Co.*, 64 Mass. App. Ct. 347, 357 n.9 (2005), it appears that John Ahern worked as a chef at a nursing home in Chestnut Hill, owned and operated by the defendant, Beverly Enterprises-Massachusetts, Inc: (Beverly). On the day of the accident, Ahern's supervisor, Lynda Pacitti, arranged to meet him at the South Pacific restaurant after his shift ended to prepare plans for a public health survey that was to take place the following week. Pacitti and Ahern had worked together at the nursing home for more than twenty-five years. Pacitti knew Ahern well and knew that he lived in Tewksbury, some distance from the nursing home. Although the two had been coworkers for the first fifteen years they worked together, Pacitti had been Ahern's supervisor for the ten years preceding the accident and, as such, had the authority to discipline Ahern and to fire him if necessary.

The South Pacific restaurant was "a couple of miles" from the nursing home. Pacitti and Ahern met there at approximately 5:45 P.M., though Ahern had arrived about five minutes earlier. The upcoming survey was important to Beverly and to Pacitti, so she arrived with nursing home menus in hand and discussed those menus and other business matters with Ahern during the approximately one hour and fifteen minutes their meeting lasted. Their discussion during the meeting focused entirely on business topics. It was, in Pacitti's view, a productive business meeting.

During the meeting, both Pacitti and Ahern drank alcoholic beverages. Ahern, who had consumed no alcoholic beverages that day prior to the meeting, chose vodka and soda water. Whatever alcohol he drank that evening, he drank in Pacitti's presence. Ahern had those drinks despite the fact that he planned to drive home after the meeting, a fact of which Pacitti was aware, and despite the fact that he had two prior convictions for drunken driving, one of which caused him to miss several weeks of work at Beverly so that he could attend inpatient rehabilitation.[1]

---

[1] The plaintiff argues that the record is sufficient to support an inference that

The drinking in which Pacitti and Ahern engaged also occurred despite a section of Beverly's human resources management policy and procedures manual which stated, in pertinent part, that employees were

> "prohibited from possessing, consuming, selling, distributing, or being under the influence of alcohol on company premises or *while conducting company business off company premises*" (emphasis supplied).

Ahern left the restaurant at approximately 7:00 P.M. Eight minutes later, he struck the plaintiff, a pedestrian who was crossing a street near an on-ramp to Route 128, causing serious injuries. Officers arriving at the scene smelled alcohol on Ahern's breath and found him glassy-eyed, slurring his speech, and having difficulty maintaining his balance as he walked. He failed field sobriety tests, in the process switching from English to what he said was French as he tried to race through the alphabet and, when instructed to use English alone, failing to make it past the letter "M." After a jury trial, he was convicted of operating under the influence. A jury would be warranted in concluding that the gross deficits in Ahern's ability to navigate did not manifest themselves for the first time during the eight minutes between his departure from the restaurant meeting and the accident, but became visible as the meeting, and the drinking, progressed.

There is, to be sure, evidence that points in a direction different from the direction the foregoing narrative suggests. Pacitti, for example, testified that Ahern had only one and one-half drinks that evening and was completely sober and unimpaired when he left the meeting at 7:00. Nevertheless, if the plaintiff persuades a jury at trial that the narrative is an accurate reflection of what happened on the evening of the accident, then I believe that ordinary principles of respondeat superior permit the jury to return a verdict against Beverly.

Under the doctrine of respondeat superior, Beverly is liable for the conduct of its employees while they are acting within

Beverly, through Pacitti or others, had knowledge of Ahern's prior alcohol problems. I make no judgment one way or another on that score, believing that knowledge of those prior difficulties is not essential to the result I believe the record otherwise compels.

the scope of their employment. See *Dias* v. *Brigham Med. Assocs.*, 438 Mass. 317, 319-320 (2002), citing Restatement (Third) of Agency § 2.04 (Tentative Draft No. 2, 2001). Apart from her drinking, there can be no doubt that Pacitti was acting within the scope of her employment while meeting with Ahern. She called the meeting to discuss matters of importance to Beverly and spent the entire meeting doing just that.[2]

That Pacitti may have been acting for her own purposes when she drank and permitted Ahern to drink does not mean that she was acting outside the scope of her employment.

> "[C]onduct of an agent is within the scope of employment if it is of the kind he is employed to perform . . . ; if it occurs substantially within the authorized time and space limits . . . ; and if it is motivated, at least in part, by a purpose to serve the employer . . . . See Restatement (Second) of Agency § 228 (1958). The fact that the predominant motive of the agent is to benefit himself does not prevent the act from coming within the scope of employment as long as the act is otherwise within the purview of his authority."

*Wang Labs., Inc.* v. *Business Incentives, Inc.*, 398 Mass. 854, 859-860 (1986).

As for negligence, Pacitti had supervisory power over Ahern and could have chosen to enforce Beverly's rule prohibiting consumption of alcohol at off premises business meetings. And

---

[2]It is no answer to say that the negligent act was Ahern's decision to drive while intoxicated and Beverly is not responsible for that decision. See, e.g., *Clickner* v. *Lowell*, 422 Mass. 539, 542-543 (1996) ("Travel to and from home to a place of employment generally is not considered within the scope of employment"). The focus should be on Pacitti's acts and omissions, not Ahern's. A jury could conclude that it was just as reasonable to foresee that an intoxicated Ahern would drive away from the meeting as it was to foresee that an intoxicated patron would drive away from a bar where he had been over-served, see, e.g., *Cimino* v. *Milford Keg, Inc.*, 385 Mass. 323, 328-331 (1982), or that drunken passengers would alight from a limousine and drive home from the dropping off point. See *Commerce Ins. Co.* v. *Ultimate Livery Serv., Inc.*, 452 Mass. 639, 646-647 (2008). Therefore, while it was undoubtedly negligent, and worse, for Ahern to drive while intoxicated, Ahern's negligence does not necessarily sever the causal connection between what a jury could find was Pacitti's negligence in permitting Ahern to drink and the resulting accident.

whatever the case in other jurisdictions, it is clear that in Massachusetts "[a]n employee's violation of his employer's rules, intended to protect the safety of third persons, is evidence of the employee's negligence, for which the employer may be held liable." *Commonwealth* v. *Angelo Todesca Corp.*, 446 Mass. 128, 138 (2006). Beverly's "no alcohol" rule doubtless stemmed in part from a belief that sober employees make better decisions, but a jury could surely conclude that the rule was also designed to protect the safety of others from harm caused by intoxicated Beverly workers. A jury, therefore, could conclude that Pacitti was negligent in failing to enforce that rule, particularly in the face of what it could infer were visible signs of Ahern's intoxication.

Finally, if a jury were to find facts the present record permits them to find, I cannot agree with the majority that the "social host" cases bar imposition of liability. The cases barring liability have differentiated between the host who can and the host who cannot regulate the supply of liquor. Thus, in *Ulwick* v. *DeChristopher*, 411 Mass. 401, 406 (1991), the court said that "[p]olicy considerations support the imposition of a duty only in cases where the host can control and therefore regulate the supply of liquor. A host who furnishes liquor at a social gathering can deter a guest from becoming intoxicated." Similarly, in *Mosko* v. *Raytheon Co.*, 416 Mass. 395, 402 (1993), the court opined that "[o]nly when a host controls the liquor supply is it reasonable to assume that a host has the ability to monitor the guests' alcohol consumption." And in *Kelly* v. *Avon Tape, Inc.*, 417 Mass. 587, 589 (1994), the court, citing its earlier decisions, said that the defendant had no duty to protect members of the public from the consequences of its employee's intoxication because it had not furnished the alcohol the employee consumed.

All of those cases are premised on the difficulty, if not the impossibility, of a social host's exercise of control over the behavior of a social guest. As the court observed in *Ulwick* v. *DeChristopher*, 411 Mass. at 406:

> "The ability effectively to control a guest's excessive drinking is not present when the liquor belongs to the guest. Therefore, to impose a supervisory duty on social hosts to

police the conduct of guests who drink their own liquor presents a number of practical difficulties. Hosts in these circumstances might be left with little alternative than to resort to physical force in order to discourage further drinking or to try to eject the guest, a solution that in many cases will aggravate the situation and put the drunk driver where he should not be — behind the wheel of a car."

Inability to control the guest leaves control of alcohol as the host's only mechanism for preventing intoxication. A social host with no control of the alcohol supply and no control over the social guest should not, therefore, be saddled with the consequences of the guest's intoxication.

Implicit in that analytical framework, however, is that control of the alcohol supply is one of two obvious ways to prevent intoxication. The other is control of the consumer. A jury could conclude that, unlike the social host, the employer conducting a business meeting can control the employee's behavior, particularly where, as here, the employer's ability to control that behavior is evidenced by promulgation of an anti-alcohol rule purporting to do so. Because of the critical difference in the dynamics of the relationship between social host and social guest, on the one hand, and employer and employee, on the other, I do not believe that the social host cases are a bar to Beverly's liability. See generally, e.g., *O'Gorman* v. *Antonio Rubinaccio & Sons*, 408 Mass. 758, 762-763 & n.4 (1990), and cases cited.

In sum, I am of the opinion that the motion for summary judgment should have been denied and the case against Beverly set for trial.